UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

UNITED STATES OF AMERICA,

        -against-                                       17 Cr. 00475(WFK)

DILSHOD KHUSANOV,

        *Defendant.*

-------------------------------------------------------------X

## SENTENCING MEMORANDUM ON BEHALF OF DILSHOD KHUSANOV

                        Richard W. Levitt
                        LEVITT & KAIZER
                        40 Fulton Street, 17th Floor
                        New York, New York 10038
                        (212) 480-4000

                        Deborah Colson
                        COLSON LAW PLLC
                        80 Broad Street, 19th Floor
                        New York, New York 10004
                        (212) 257-6455

                        *Attorneys for Dilshod Khusanov*

August 2, 2022

## Table of Contents

Table of Authorities ................................................................................................................ii

Introduction ...........................................................................................................................1

Offense Conduct ....................................................................................................................2

Objections to PSR ..................................................................................................................3

Adjustment in Prison .............................................................................................................4

Letters of Support ..................................................................................................................8

Guidelines Calculation.........................................................................................................11

Family Circumstances..........................................................................................................12

Collateral Consequences of Conviction...............................................................................13

Recommendation .................................................................................................................14

## **Table of Authorities**

Page(s)

**Cases**

*Gonzalez v. United States*, 2014 WL 4494020 (Sept. 12, 2014 S.D.N.Y.)......................................6

*United States v. Acosta de la Rosa (*PKC) ...................................................................................5

*United States v. Arvinsingh Canaye*, No. 18 Cr. 102 (KAM), (E.D.N.Y.) ....................................5

*United States v. Bruney*, No. 18-cr-542 (PKC) ..........................................................................5, 6

*United States v. Carty*, 264 F.3d 191 (2d Cir. 2001) .....................................................................6

*United States v. Francis*, 129 F. Supp. 2d 612 (S.D.N.Y. 2001) ...................................................6

*United States v. Ivars Ozols*, No. 16 Cr. 692 (JMF) (S.D.N.Y.) ....................................................6

*United States v. Khusanov*, 731 F. App'x 19 (2d Cir. 2018) .........................................................2

*United States v. Lincoln Douglas*, No. 18 Cr. 554 (PKC), (E.D.N.Y.) ..........................................5

*United States v. Mateo*, 299 F. Supp. 2d 201 (S.D.N.Y. 2004) .....................................................6

*United States v. Ozols*, No. 16- cr-692 (JMF) (S.D.N.Y.) .............................................................5

*United States v. Puerta*, 249 F. App'x 359 (5th Cir. 2007) .........................................................12

*United States v. Ricardo Forde*, No. 18 Cr. 550 (CBA), (E.D.N.Y.) ............................................5

**Statutes**

18 U.S.C. § 2332 ...........................................................................................................................12

18 U.S.C. § 2339B ..........................................................................................................................1

18 U.S.C.§ 3553 ............................................................................................................................15

18 U.S.C. § 3553(a) ........................................................................................................................6

USSG § 3A1.4(a) ..........................................................................................................................12

**Other Authorities**

Federal Rules of Criminal Procedure Rule 11(c)(5) .......................................................................3

https://en.wikipedia.org/wiki/Metropolitan_Detention_Center,_Brooklyn#Winter_
    2019_heating_and_power_issues ............................................................................................5

https://www.bop.gov/coronavirus/ ................................................................................................7

Kristin Turney and Rebecca Goodsell, *Parental Incarceration and Children's Wellbeing, The Future of Children*, Vol. 28, No. 1 ..................................................13

Osborne Association, *A Call to Action: Safeguarding New York's Children of Incarcerated Parents* (May 2011) .......................................................................13

Rule 11(c)(1)(C) ...................................................................................................1, 12, 14

### SENTENCING MEMORANDUM ON BEHALF
### OF DILSHOD KHUSANOV

Dilshod Khusanov's sentencing is scheduled for August 10, 2022. He pleaded guilty on October 18, 2021, to a violation of 18 U.S.C. § 2339B ("Providing material support or resources to designated foreign terrorist organizations"), pursuant to a Rule 11(c)(1)(C) plea agreement recommending that the Court impose a 132-month sentence. The purpose of this memorandum is to provide the Court additional information regarding Mr. Khusanov, his involvement in the instant offense, and the appropriate sentence to be imposed.

Mr. Khusanov (age 36) was born in Uzbekistan. He first entered the United States in 2008 on a student visa and has since gained permanent resident status. College educated, Mr. Khusanov is a fluent English speaker. He is married to Aziza Erkinova and together they have three children, one of whom has autism spectrum disorder. During his entire time in the United States, prior to his arrest in this case, Mr. Khusanov was either a student, or gainfully employed, or both. He principally worked as a long-haul truck driver, generally driving several thousand miles each week. He has always had an acute sense of public obligation and has consistently given generously to a variety of legitimate charitable causes.

When Mr. Khusanov came to this country, his life was full of promise. Because he was well educated, spoke English and was willing to work hard, he was able to integrate into American society and care for his family. He very much appreciated the opportunities this country gave him, and this gratitude is clear from the evidence we received in discovery. For example, in a recorded conversation with an unidentified male on November 9, 2015, Mr. Khusanov is overheard praising U.S. law enforcement for leaving the relatives of suspects alone and acting only with sufficient evidence. In a December 10, 2015, conversation with Mirmansur Mirsultanov and Nurbek Abdullaev, Mr. Khusanov and Mirsultanov agree that the United States is open minded and

1

tolerant and one of the better places for Muslims because they are permitted practice their religion freely.

Unfortunately, Mr. Khusanov's warm feelings for the United States have since been severely tested. He was arrested in this case on August 31, 2017, and has been incarcerated ever since – a period of nearly <u>five years</u>. He lived through the horrific MDC blackout of 2019, and has suffered through the COVID-19 scourge, contracting the virus in jail and being subjected to numerous lockdowns and quarantines. He has received horrible medical treatment at MDC. An injury to his right knee was not adequately treated, resulting in what appears to be a permanent inability to fully extend the knee as well as an abscess thereon. MDC also failed to afford him proper and timely dental treatment. Eventually, four of his teeth had to be pulled. Due to conditions at MDC and the remoteness of his family, he has seen his wife in person only once since the advent of COVID. His time in jail – like that of his fellow inmates – has been "hard" time by any measure.

**<u>Offense Conduct</u>**

What did Mr. Khusanov do to deserve this fate? When Akhror Saidakhmetov planned to travel to Syria in February 2015 to wage Jihad – or "struggle" – against Bashar Al-Assad's murderous regime, Abror Habibov instructed Akmal Zakirov to call Mr. Khusanov and ask him to donate generously to assist Saidakhmetov's travel. After several conversations with Zakirov and someone identified as "CC-1", Mr. Khusanov transferred, or caused to be transferred, only modest funds to Zakirov's account (PSR at ¶ 15); as the Second Circuit observed in its bail decision, "At oral argument, the government clarified that Khusanov himself actually contributed only $200 to $400." *United States v. Khusanov*, 731 F. App'x 19, 21 (2d Cir. 2018).

Mr. Khusanov's crime was that he made a relatively small amount of money available to facilitate Saidakhmetov's travel to join ISIS or Al Nusra Front. Importantly, he never threatened

2

the United States or otherwise expressed ill-will toward this country; on the contrary, as the referenced conversations reflect, he respected the United States and the freedom it gave him and fellow Muslims to worship. His goal was to assist others to oppose the brutal and oppressive regime of our common enemy, Bashar Al-Assad. In fact, many of his personal writings attest to his passionate disagreement with the ideology and tactics of ISIS and ANF. He accepts full responsibility for his offense, which he describes in his letter to the Court as "one of the biggest mistakes and wrong decisions" in his life. "When I ask myself … if I learned my lesson," he adds, "the first thing that comes to mind is my handicapped son, my family and my aging parents whom I caused a lot of pain and anguish. I hardly find the right words to express the state of my heart and mind. I wish I could describe how much I mis[s] my whole family and how much I want to be with them…. I believe that answers my question."

**Objections to PSR**

In a letter dated April 19, 2022, we advised the Probation Department of our objections to the Presentence Report. Probation adopted some of our objections and declined to adopt others. We ask that the Court rule on the objections that remain in dispute as the erroneous facts to which they relate may influence Mr. Khusanov's conditions of confinement. They are:

> **Paragraph 1:** Probation's description of the "Charges and Conviction(s)" fails to include the terms of Mr. Khusanov's plea agreement with the government. The following language should be added:
>> According to a written plea agreement dated October 13, 2021, the parties agree "that a specific sentence of 132 months' imprisonment and a supervised release term of life is the appropriate term of imprisonment and term of supervised release in this case." The parties further agree that, "[i]f the Court rejects this plea agreement pursuant to Rule 11(c)(5) of the Federal Rules of Criminal Procedure," either party "shall be afforded the opportunity to withdraw or vacate the plea."
>
> **Paragraph 9**: Delete "Abror Habibov" from the first sentence of the paragraph. Based on our review of the discovery, Mr. Khusanov did not "work closely" with Mr. Habibov to help fund Saidakhmetov's efforts to travel to Syria. Indeed, he never once spoke to Mr. Habibov about the matter. Also delete the final three sentences of the paragraph beginning

3

at "With the support of this domestic network…." The government never provided the defense with evidence—if any—of Mr. Khusanov's connection to the three individuals who allegedly traveled to Syria.

**Paragraph 15**: Delete "Habibov" from the first sentence of the paragraph. As stated above, Mr. Khusanov never spoke directly with Mr. Habibov about providing or raising money to fund Saidakhmetov's travel.

**Paragraph 20**: Delete paragraph 20 in its entirety because the sole communication referenced has no bearing on Mr. Khusanov's intent to provide material support to ISIL. There is no mention of ISIL in the message quoted, and the references to "jihad" and "mujahedeen" are too vague to establish an intent to support ISIL. The term "jihad" simply means a struggle or fight against one's own evil inclinations or for the moral betterment of the Muslim community. The term "mujahedeen" refers to the strugglers or strivers who engage in jihad.

**Paragraph 21**: We do not challenge the Guidelines calculation but nonetheless believe it inaccurate to describe Mr. Khusanov as an "average participant," even if his limited participation does not support a Guidelines adjustment.

**Adjustment in Prison**

During much of Mr. Khusanov's incarceration, he has lived under brutal conditions occasioned by the nature of his offense, the 2019 blackout, and the ongoing COVID-19 epidemic. Yet, he has received not a single disciplinary infraction.

Mr. Khusanov informs us that, in early 2018, he was put on a two-hour watch list at the MDC. Each day for six months, he was required to report to the guards' office once every two hours. Each time he appeared a few minutes early, he was sent away and told to come back at the designated time; and each time he appeared a few minutes late, he was told that his punishment might include his transfer to the SHU. Mr. Khusanov's frequent reporting to the guards aroused the suspicion of other inmates, some of whom thought he was a government cooperator and/or that he was informing on illegal activities inside the prison. It also made it difficult for him to participate in educational or recreational activities because he lived in constant fear of reporting a few minutes late. Desperate to understand why he had been placed on the watch list, he submitted

4

multiple requests for explanation, beginning with his Unit Team and moving through various levels of administration until he eventually reached the Warden. But he never received a response. Each one of his requests was ignored.

Then came the blackout of 2019, during which Mr. Khusanov and his fellow inmates spent nearly ten days with no light, heat, hot water, or showers and no access to email or the phones. They were completely cut off from the outside world. Those inmates who protested the conditions through hunger strikes and other non-violent disobedience "faced draconian reprisals from jail staff, including being pepper sprayed, subjected to solitary confinement and having toilets shut off."[1] Indeed, "[o] n all three of those housing units where men collectively refused food, jail staff shut off the valves to the toilets in all of the cells." *Id.*

Judges in the EDNY and SDNY have recognized the qualitatively severe conditions experienced by MDC inmates incarcerated during the blackout and have adjusted sentences to reflect this reality. For example, in imposing a below-guidelines sentence in *United States v. Ozols*, No. 16- cr-692 (JMF) (S.D.N.Y.), Judge Furman remarked:

> [I]t's pretty clear to me . . . that steps could have been taken, and taken more quickly, to address the problems [at the MDC]. And the bottom line is, the conditions that I read about are the conditions that one associates with a third world country and not a country like this, and nobody in detention . . . should have to endure that as the detainees did at the MDC.

In several cases, these conditions have been referenced as at least partial justification for below-guidelines sentences. *See, e.g., United States v. Bruney*, No. 18-cr-542 (PKC); *United States v. Ricardo Forde*, No. 18 Cr. 550 (CBA), (E.D.N.Y.); *United States v. Acosta de la Rosa (*PKC) (same); *United States v. Lincoln Douglas*, No. 18 Cr. 554 (PKC), (E.D.N.Y.); *United States v.*

---

[1] See https://en.wikipedia.org/wiki/Metropolitan_Detention_Center,_Brooklyn#Winter_2019_heating_and_power_issues

5

*Arvinsingh Canaye*, No. 18 Cr. 102 (KAM), (E.D.N.Y.); *United States v. Ivars Ozols*, No. 16 Cr. 692 (JMF) (S.D.N.Y.), *United States v. Memet Gezer,* 16 Cr. 282 (CM) (S.D.N.Y.). Judge Chen summarized the basis for variance in *Bruney* as follows:

> One final consideration that I do think also merits a variance downward from the guideline range, and that is the horrific conditions that existed at the MDC as of January 27, 2019 . . . which are the subject of two separate lawsuits that are pending in this courthouse now, but I don't need to look beyond the headlines of the newspaper for the last month or so to understand how terrible the conditions were for at least two weeks starting from January 27, 2019. Those conditions were well documented and had been investigated by various outside individuals including Congress people, counsel people and the media, and obviously have been alleged in two separate lawsuits.
>
> To recite them, to the extent that they are already a matter of public record, starting on January 27, 2019, when there was a fire at the facility, the MDC, there was no heat, there was no lighting at night, there was barely edible food and barely any food, the defendants were cut off from any contact with the outside world because the computer system went down and that included their attorneys, and that is what allowed the circumstances to continue unpublicized and unremedied for quite a long time, an inordinate and inexcusable amount of time.
>
> I am not going to opine on whether or not there was (were?) falsehoods told by the prison officials, that is for another body to decide, but certainly the extent of the situation was not fully reported until far too late, in my opinion, despite efforts by the Court and by other, as I mentioned before, outside bodies to try to get further information and despite efforts by defense counsel to report to the court what was happening. These circumstances were unacceptable and deplorable and certainly not fitting of confinement, conditions of confinement in this country and certainly not in this District. So that is a significant mitigating factor as well. So, for all of those reasons, I am going to grant the request of time served in this case.[2]

---

[2]    More generally, pre-trial conditions of confinement can serve as a basis for a downward departure, *see United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001); *see also United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (pretrial conditions "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case" justified reduced sentence); *United States v. Francis*, 129 F. Supp. 2d 612, 619-20 (S.D.N.Y. 2001) (same), and are a factor courts can consider under 18 U.S.C. § 3553(a). *See Gonzalez v. United States*, 2014 WL 4494020, at *4 (Sept. 12, 2014 S.D.N.Y.).

As horrible as the blackout was, at least its duration was limited. The conditions occasioned by COVID-19, by contrast, present an ongoing crisis, subjecting inmates to dangerous, sometimes life-threatening environments, requiring repeated, long-term lockdowns,[3] limiting or eliminating entirely various programming, preventing both social and legal visits for extended periods, and generally creating a frightening and hostile atmosphere within the facility.

At least 633 MDC inmates have thus far contracted COVID, and at least one has died.[4] Mr. Khusanov got COVID twice. On the first occasion, he was infected by a fellow inmate who was transferred into Mr. Khusanov's cell, even though the inmate already had obvious COVID symptoms. Mr. Khusanov suffered a long, serious illness with multiple symptoms, including headaches and sinus congestion. He has still not fully recovered his taste and smell. On the second occasion, in November 2020, Mr. Khusanov experienced severe shortness of breath and excruciating body pains. Because he has chronic asthma, he repeatedly requested permission to leave his cell and walk around the recreation area to get some "fresh air." Each time, however, he was told that many inmates had asthma and so no special allowances would be made for him.

These horrid conditions notwithstanding, Mr. Khusanov has endeavored to maintain his dignity, keep an optimistic outlook, continue to better himself, and assist others. He has completed ten educational programs at the MDC, including the Focus Forward Project and four college-level courses offered by Columbia University: (1) Critical Thinking, (2) Contemporary Western Civilization 1, (3) Contemporary Western Civilization 2, and (4) Anthropology. He has also assisted various Russian- and Spanish-speaking inmates to communicate with correctional officers

---

[3] One of the lockdowns in 2020 overlapped with the month of Ramadan. Despite approval from the Captain, Mr. Khusanov and his fellow Muslim inmates were frequently denied the opportunity to leave their cells to heat their food or obtain hot water before breaking the fast.
[4] See https://www.bop.gov/coronavirus/

7

and administrative staff. He has helped the inmates to make medical and dental appointments and has even attended appointments with them to serve as a translator. He was selected to work for psychology department as an inmate companion, but due to separation between co-defendants could not be hired. And he has counseled several inmates with suicidal thoughts, encouraging them to maintain perspective and hope for the future. Several of the certificates Mr. Khusanov has received, along with other documentation of his participation, are attached as Exhibit A.

In his letter to the Court (Exhibit B),[5] he remarks how difficult it is for his fellow prisoners to "stay out of trouble, enroll in useful and productive programs, learn new things and constantly improve their character and work on their shortcomings." He adds: "I'm really really tired of making the same mistakes. More or less, for the past five years, I learned and truly dedicated myself not to make the same mistakes twice. With the help of God and enormous love from my parents, family, and friends I'm trying to be a better son, better husband, better father and better friend every single day I'm alive."

**Letters of Support**

We attach several letters of support we have received on Mr. Khusanov's behalf, collected in Exhibit C.

Mr. Khusanov's wife, Aziza Erkinova, writes that she has known Mr. Khusanov since 2013 and "[h]e was everything I could want in a husband and father, loyal, loving, caring, nurturing and more.... Although he was a truck driver and had to be away from us for a week at a time, he always would give us 100% of his attention and time." She talks about the very typically American things they would do as a family: visits to Niagara Falls, Disneyworld, nature hikes and the like.

---

[5]   Exhibit B contains two letters, Mr. Khusanov's July 7, 2022, letter to the Court and a second letter detailing conditions within MDC.

Consistent with his respect for the United States and the opportunities it has provided him and family, Aziza reports, "Dilshod was not the stereotypical central Asian muslim man that people portray. He would wake up before me and prepare us breakfast, he would take the kids downstairs so I could get much needed sleep, he would cook me dinners and treated me with the upmost respect." She also discusses her husband's charitable nature and his willingness to help others in need. She adds that life has been very difficult for the family since his incarceration; both money and space have been tight, with Aziza and her three children living with her parents, brother, and brother's family. She continues: "My second son ▅▅▅ has severe autism, he is six years old and cannot speak, use the restroom or do a lot of basic things on his own." Her youngest "doesn't even know who his father is, he only hears his voice when he calls us." She concludes that, "[d]espite his current circumstance, I believe Dilshod is a honorable individual is society, never backs away from someone in need, and a good person." Exhibit C, Letters of Support, at 1-2.

Mr. Khusanov's religious leader, Habibur Rahman Khan, who has served for 23 years as Imam at the Islamic Foundation in Villa Park, Illinois, has known Mr. Khusanov for four or five years, and certainly has developed respect for him, noting such personal details as "Dilshod and his friends would also invite me to their barbeques and other family gatherings out of respect they felt towards me. I have attended some gatherings with Dilshod and others." He summarizes his interactions with Dilshod as follows:

> In my direct interactions with him, I found him to be someone who was respectful, kind, and warm. He gave me respect as a community leader and religious teacher. I have never found him to be aggressive in his words or demeanor. In our informal class, I found him to be helpful towards others and engaging in a socially responsible manner. Throughout the time I had known him, I have never found anything concerning in Dilshod's character or demeanor. I never witnessed him present in a manner that was concerning or questionable.

Exhibit C, Letters of Support, at 3.

Mr. Khusanov's mother, Khusanova Valida Ikramovna, who writes in Uzbek, but whose letter is included in both its original and translated forms, writes that she and her husband are both college graduates, as are all three of her children. Reflecting on Mr. Khusanov's childhood, she recollects, "Dilshod was keen on learning from the childhood. He would do his homework on time, getting always high [A] grades at school. I always would return from parents' meeting very happy, for his teachers would always praise [commend] him. After school, he used to help me at home, especially he very much liked to bake buns with me in the kitchen…When my daughters were born, he was extremely happy. He would always entertain his sisters and protect them from other children. When his sisters went to school, he would help them to do their homework." The neighbors all liked Mr. Khusanov: "They wanted their children to be like him - as kind, well-behaved and smart. Even two neighbors of ours named their [children] grandchildren after Dilshod, hoping that they would resemble him all around." "By nature," she says, "Dilshod was compassionate and soft-hearted boy. When he was at college, he and his college mates would buy some gifts from their stipend and donate them to children in orphanage." After college he worked as a translator for Korean students, "[y]et his biggest dream was to study in USA. He would always tell me 'Mommy, for sure, I'll go and study in that great country' and have high ambitions." After Mr. Khusanov established his family in the United States and the family learned that his son was autistic, "it broke our heart. But Dilshod accepted it as a test from God and stayed calm [and optimistic]. He strongly believed that we could beat the disease. He would work and spend lots of time with ▮▮▮" He "is [a] caring father, beloved husband and trustworthy friend. We all love Dilshod very much, miss him a lot and hope we will see him outside very soon. We continuously pray for him." Exhibit C, Letters of Support, at 4-5.

We also include a letter from Elyse Frenchman and Kayla Jenkins of the Focus Forward Project, which they describe as "*a nonprofit organization dedicated to providing an educational curriculum focused on reentry for federal pretrial inmates and those under pretrial supervision.*" Mr. Khusanov graduated from their program in 2018, and it is clear from the letter that he made a deep impression on them. It is worth quoting from the letter at length:

> Dilshod was one of the most participatory and engaged members of the class. He had perfect attendance, showing up to every class on time with all assignments thoughtfully completed. He worked hard to learn as much as he could from the class, and this dedication inspired the other participants to work hard and be present.
>
> Dilshod has a strong drive to better himself and to learn. During discussions about A Long Way Gone, we could always tell that he had carefully read the text and tried to apply the lessons to his own life. He empathized with Ishmael and the other soldiers in the book, and often picked up on silver linings at moments in the story where his classmates could only focus on Ishmael's pain. During a public speaking exercise, Dilshod described an incident in his adolescence where he let himself down by not excelling on an important academic test, even though he had worked hard to prepare for it. He thought his parents would be disappointed, but their reaction was only positive when they emphasized their pride in the fact that he had tried his best.
>
> During one class, each participant wrote long term goals and made plans for how to achieve them. One of Dilshod's goals is to have his kids say, "Daddy is back home!," and to be able to provide the best possible education for his children. Like his own supportive parents, he loves his family and understands that everything he does affects his children…
>
> In a confidence building exercise, Dilshod's peers described him as thoughtful, positive, always willing to give, compassionate, and considerate. We wholeheartedly agree with each of these descriptors. Dilshod wears his heart on his sleeve and his compassion is real. During the graduation ceremony for the class, we read small speeches about each of the participants. After reading Dilshod's, he was tearing up and smiling. He is not afraid to be and show himself, a rare and admirable quality. We were inspired by Dilshod's determination to do the best he can while incarcerated, and we both can envision Dilshod's positive contributions to society when he is no longer behind bars.

Exhibit C, Letters of Support, at 12-13.

**Guidelines Calculation**

Because the parties have entered into a plea agreement pursuant to Rule 11(c)(1)(C), the Court is required to explain why it is imposing a sentence substantially below the Sentencing

11

Guidelines range as agreed to in the plea agreement and as calculated in the PSR, based on a final offense level of 37 and a CHC of VI. We have agreed to this offense level, as calculated with the 12-point/CHC-6 terrorism enhancement pursuant to USSG § 3A1.4(a),[6] because we understand the Second Circuit and other courts have approved imposition of the enhancement in like cases. Nonetheless, we wish to make clear our view that Mr. Khusanov's offense falls outside the core conduct for which § 3A1.4(a) was intended. Assuming § 3A1.4(a) applies to crimes calculated to affect the conduct of a foreign government, rather than the government of the United States (as held e.g., *United States v. Puerta*, 249 F. App'x 359 (5th Cir. 2007)), the goal of punishing terrorist-related conduct more severely has no rational application to a defendant seeking to mitigate the murderous designs of a United States enemy, such as Syria. Without the enhancement, Mr. Khusanov's offense level would be 26 minus 3 or 23, with a Guidelines range of 46-57 months.

**Family Circumstances**

Prior to his arrest, Mr. Khusanov's family was his priority and singular focus. He spent most of his free time taking his autistic son, ▇▇▇ to early intervention therapies and other enrichment activities, "hoping it would trigger his recovery process." Mr. Khusanov was also saving money to enroll ▇▇▇ in a private school for autistic children that had a particularly good reputation. All of Mr. Khusanov's hopes and expectations for ▇▇▇ vanished the moment he was arrested. His wife was left to raise three children on her own and could not afford the sorts of programs Mr. Khusanov had dreamed of. Five years later, the window of opportunity is closing.

---

[6]    For purposes of the terrorist enhancement, "federal crime of terrorism" has the meaning given that term in 18 U.S.C. § 2332b(g)(5), i.e.,
> **(5)** the term "Federal crime of terrorism" means an offense that—
> **(A)** is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and
> **(B)** is a violation of….18 USC 2339(b).

12

Now six and a half years old, Mr. Khusanov writes that ▮ "neither speaks nor socializes with any other kids, not even with his siblings who are eight and five and a half. And he cannot even use the bathroom on his own. He communicates all his needs including need for food and drink by pointing to the objects."

It goes without saying that the longer Mr. Khusanov is gone, the more likely his absence will have long-term effects, both on ▮ and his other children. "[P]arental incarceration is now recognized as an 'adverse childhood experience' (ACE) of the type that can significantly increase the likelihood of long-term negative outcomes for children." The Osborne Association, *A Call to Action: Safeguarding New York's Children of Incarcerated Parents*, at 12 (May 2011); *see id.* ("[R]esearch suggests that parental imprisonment more often intensifies and compounds, rather than alleviates, the challenges children face."). Indeed, "[c]ompared to other children, those who experience parental incarceration suffer impairments across four domains of wellbeing: behavior, education, health, and hardship and deprivation." Kristin Turney and Rebecca Goodsell, *Parental Incarceration and Children's Wellbeing, The Future of Children*, Vol. 28, No. 1, Reducing Justice System Inequality, at 148 (Spring 2018). This factor alone warrants the Court's serious consideration.

### Collateral Consequences of Conviction

In negotiating the plea agreement in this case, the Government insisted on language that will foreclose any effort by Mr. Khusanov to remain in this country regardless of the hardship it will impose on his innocent wife and children or the fate that may await him in Uzbekistan. Thus, his family will need to decide whether they will be permanently separated, with Mr. Khusanov's wife and children remaining in the United States while he is permanently barred from this country, or whether his wife and children will return with him to Uzbekistan, thereby uprooting his

13

children—all United States citizens—from the only home and country they have known. This uprooting of the Khusanov family will be extremely difficult and life-changing for all three of his children, but particularly so for ▇ who could not possibly receive the same quality of services in Uzbekistan as in the United States.

Thus, the price the Government has exacted in exchange for Mr. Khusanov avoiding an even more Draconian sentence than that prescribed by the plea agreement presented him with a Hobson's choice of existential proportions.

### Recommendation

We understand that pursuant to the plea agreement and Rule 11(c)(1)(C), this Court may not impose a sentence less than eleven years without the Government's permission. Thus, we respectfully ask the Court to recommend that the Government agree to a lower sentence and that the Court impose a lower sentence. Mr. Khusanov does not deserve an eleven-year sentence. His criminal conduct was limited. It reflected no animus toward the United States, nor did he desire to advance the ideology of a terrorist organization. Rather, his motive in arranging for the transfer of the minimal funds involved in his offense conduct was to assist the struggle against Bashar Al-Assad, an enemy he shared with the United States. Although only the Government – and not an individual such as Mr. Khusanov – can decide when to join league with an enemy to fight a common enemy, there can be no doubt that we have done so on numerous occasions, on the theory that "the enemy of my enemy is my friend." We joined the Soviet Union to fight the Nazis in World War II. We assisted the Afghan Mujahideen after the Soviet invasion. And we supported the Iraqi government under Saddam Hussein during the Iran–Iraq War as a strategic response to the 1979 Iranian Revolution. Mr. Khusanov's conduct was misguided, but not venal.

Because this is an 11(c)(1)(C) plea, the Court can simply accept the agreement and impose sentence. But we respectfully suggest that an objective view of Mr. Khusanov's history and motivation, as well as the inappropriateness under these facts of applying the Guidelines' terrorist adjustment, suggest that a substantially lower sentence would be fair, just, and consistent with the need to impose "a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing as prescribed by 18 U.S.C.§ 3553. We therefore ask that the Court suggest to the Government that it agree to a lower sentence and that a lower sentence be imposed. And we respectfully request that the Court recommend that Mr. Khusanov be housed at the Federal Correctional Complex in Coleman, Florida, the closest facility to his wife, children, and aging in-laws, who all live in Tampa Bay.

Dated: New York, New York
       August 2, 2022

                                          Respectfully submitted,

                                          */s/ Richard Levitt*

                                          Richard Levitt
                                          Levitt & Kaizer
                                          40 Fulton Street, 17th Floor
                                          New York, N.Y. 10038
                                          (212) 480-4000

                                          Deborah Colson
                                          Colson Law PLLC
                                          80 Broad Street, 19th Floor
                                          New York, N.Y. 10004
                                          (212) 257-6455

                                          Attorneys for Dilshod Khusanov